# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 17-23902-CIV-ALTONAGA/Goodman

CDG INTERNATIONL CORP.,

     Plaintiff,

v.

Q CAPITAL STRATEGIES, LLC and
LIFE SETTLEMENT SOLUTIONS, LLC,

     Defendants.

_____/

### ORDER

**THIS CAUSE** came before the Court on Defendants, Q Capital Strategies, LLC and Life Settlement Solutions, LLC's Motion to Dismiss Complaint Pursuant to Rule 12(b)(6) [ECF No. 14], filed November 22, 2017. The Court has carefully reviewed the Complaint [ECF No. 1] and its attachments [ECF Nos. 1-1 to 1-3]; the present Motion; Plaintiff, CDG International Corp.'s Memorandum of Law in Opposition to Defendants' Motion to Dismiss [ECF No. 23]; Defendants' Reply [ECF No. 26]; and applicable law. For the reasons explained below, the Motion is granted in part and denied in part.

## I.    STANDARD

The standard governing review of a Rule 12(b)(6) motion is well established. "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me

accusation." *Id.* (alteration added) (quoting *Twombly*, 550 U.S. at 555). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).

To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (alteration added) (citing *Twombly*, 550 U.S. at 556). "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citation omitted), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012).

On a motion to dismiss, a court construes the complaint in the light most favorable to the plaintiff and accepts its factual allegations as true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)). Unsupported allegations and conclusions of law, however, will not benefit from this favorable reading. *See Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."); *see also Sinaltrainal*, 578 F.3d at 1260 ("[U]nwarranted deductions of fact in a complaint are not admitted as true for the purpose of testing the sufficiency of [a] plaintiff's allegations." (alterations added; internal quotation marks omitted) (quoting *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005); other citation omitted)).

The scope of review on a motion to dismiss under Rule 12(b)(6) is limited to the four corners of the complaint. *See Speaker v. U.S. Dep't of Health and Human Servs. Ctrs. for*

*Disease Control and Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010) (citation omitted). Where a plaintiff refers to certain documents in the complaint central to its claim, those documents are considered part of the pleading for the purpose of resolving a motion to dismiss. *See Brooks*, 116 F.3d at 1369 (citation omitted). Furthermore, the court "may consider an extrinsic document if it is (1) central to the plaintiff's claim and (2) its authenticity is not challenged." *Speaker*, 623 F.3d at 1379 (internal quotation marks omitted) (quoting *SFM Holdings, Ltd. v. Banc of Am. Secs., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010); other citation omitted).

## II.     BACKGROUND

### A.     Plaintiff's Allegations

According to the Complaint, Defendants orchestrated a scheme to defraud Plaintiff into massively overpaying on the purchase price paid to Defendants to secure life settlement contracts ("LSCs") on behalf of Plaintiff. (*See* Compl. ¶ 12). Defendants used their position of trust with Plaintiff and unique expertise to flimflam Plaintiff into paying more than twice what it should reasonably have paid to acquire a portfolio of 12 LSCs, while pocketing the difference between themselves and their co-conspirators and agents. (*See id.*). Defendants succeeded by using misrepresentations, omissions, and half-truths, including the fraudulent use and manipulation of a series of contracts. (*See id.*).

The life settlement industry generates a secondary market for life insurance policies; in this way, a policyholder who no longer wants a policy can sell it for a lump-sum payment in exchange for the right to the policy's death benefits. (*See id.* ¶ 13). Persons engaged in the business of purchasing or transferring policies must generally be licensed or lawfully permitted to engage in the business. (*See id.* ¶ 14). Those licensed persons are known as life settlement

providers. (*See id.*). Defendants are life settlement providers licensed to engage in these transactions in 20 states, and they hold themselves out as experts in the life settlement industry. (*See id.* ¶¶ 14–15).

Plaintiff was formed in Nevada on behalf of an Italian investment group (the "Italians") and was to serve as the vehicle for the Italians to purchase a portfolio of life settlement contracts. (*See id.* ¶ 16). The reason the Italians wanted to so invest is because a bank had advised them it would issue them a loan based on a favorable percentage of the face value of the life insurance portfolio of life settlement policies. (*See id.* ¶ 17). After meeting with the bank and financial consulting firm, The 8th Sarl, James Meulemans of The 8th lobbied the Italians so they would purchase LSCs from Defendants. (*See id.* ¶¶ 18–19). Meulemans told them The 8th would be working with Defendants to secure the best portfolio of life settlement agreements so the Italians could use the contracts as collateral to secure the loan from the bank. (*See id.* ¶ 19). These representations were made to Massimo Giorgilli, Francesca Terrinoni, and Marco Gianni. (*See id.*).

In February 2015, but before February 17, 2015, the Italians decided to pursue the acquisition of the LSCs using the services of The 8th and Defendants. (*See id.* ¶ 20). On February 17, the Italians incorporated Plaintiff on instructions from The 8th and Defendants. (*See id.*). On February 26, 2015, Plaintiff signed a master contract with Defendants for the purchase through Defendants of LSCs. (*See id.* ¶ 21; *see also* Compl. Ex. 1[1] [ECF No. 1-1] 1–

---

[1] The Court refers to the first attachment to the Complaint [ECF No. 1-1] as Exhibit 1; the second attachment to the Complaint as Exhibit 2 [ECF No. 1-2]; and the third attachment to the Complaint [ECF No. 1-3] as Exhibit 3.

11[2]).  The master contract contains as exhibits the format of the future contracts Plaintiff would be signing with either Defendant for the purchase of future specific individual life settlement policies.  (*See* Compl. ¶ 23).

Plaintiff thereafter signed 12 such agreements ("PLSCs") with Defendants, eight with Q Capital and four with Life.  (*See id.* ¶¶ 23–24; *see also* Compl. Exs. 2 & 3).  As part of the master contract, Plaintiff was required to appoint Defendants as its agents to secure the LSCs that would eventually become the PLSCs.  (*See* Compl. ¶ 26).  This was done through written Agency Appointments.  (*See id.*).

The master contract contained an Attachment C that set forth the eligibility requirements for the LSCs Defendants were to secure for Plaintiff.  (*See id.* ¶ 27; Compl. Ex. 1, 11).  In connection with the master contract, on February 26, 2015, Plaintiff also signed a disclosure document titled, "Client Profile."  (*See* Compl. ¶ 28; Compl. Ex. 3 [ECF No. 1-3] 2–17).  Between February 17 and February 26, 2015, Defendants, through their CEO Steven Shapiro and The 8th, who at all times acted as Defendants' agent, represented to Plaintiff they would secure an appropriate portfolio of LSCs for one million dollars, at the best possible price to Plaintiff.  (*See* Compl. ¶ 29).

In the life settlement industry, when representing others as undisclosed agents for the purchase of LSCs, life settlement providers generally have agreed upon a top price the client principal will pay for an LSC.  (*See id.* ¶ 33).  Assuming the life settlement provider secures the LSC within the agreed upon price range, it uses the client's money it is holding in escrow to pay the purchase price to the seller and associated costs.  (*See id.*).  The life settlement provider makes its money either on a set commission or in the spread between what it secures the LSC for

---

[2]  In citing to documents in the record, including the exhibits to the Complaint, the Court uses the pagination generated by the Case Management/Electronic Case Files system, which appears as a header on all court filings.

at auction and the acquisition price its client's principal agreed it would pay for the policy. (*See id.* ¶ 34). The life settlement industry depends on: the integrity and reliability of the information used to determine the acquisition price for the client's purchase of the LSC and the particularized skill and expertise of the person making the decision; as well as the timely (before completion of the transaction) and accurate disclosure to the client/principal by the life settlement provider of the purchase price paid to secure the LSC at auction. (*See id.* ¶ 35).

Defendants' scheme to defraud Plaintiff centered on making sure Plaintiff was never provided a copy of any of the underlying LSCs Defendants secured for Plaintiff's account, despite each PLSC specifically requiring the Defendants provide Plaintiff a copy of the LSC before Defendants could access Plaintiff's escrowed funds to complete the transactions. (*See id.* ¶ 38). Had Plaintiff timely received copies of the LSCs, it would have seen the acquisition price it paid Defendants was two to three times the amount Defendants paid at auction. (*See id.*). Defendants' scheme "was elaborate in that they and The 8th, working together and at the direction of Defendants, would engage in an elaborate kabuki dance with Plaintiff[,] feigning an elaborate non-existent auction process . . . to cause Plaintiff to continuously jack up the acquisition price to be paid Defendants for the PLSC well in excess of the price that Defendants and The 8th knew would be successful at auction." (*Id.* ¶ 39 (alterations added)). The playacting was repeated for each of the 12 PLSCs Plaintiff purchased through Defendants (*see id.* ¶ 40), resulting in Plaintiff grossly overpaying on each of 11 PLSCs it purchased through Defendants (*see id.* ¶ 49).

The master contract, Client Profile, PLSCs, and the Agency Appointment were props to camouflage that Plaintiff was 100 percent reliant on Defendants; that is, Defendants owed Plaintiff a fiduciary duty not to use their position of trust with Plaintiff to their benefit at

Plaintiff's expense. (*See id.* ¶ 50). This fiduciary relationship arises from Defendants' expressed expertise in the life settlement industry; their monopoly of information and flow of information to Plaintiff; and their access to Plaintiff's confidential business information and needs, directly or through The 8th. (*See id.*). Notwithstanding any statements in the documents that Plaintiff was charged with seeking its own independent due diligence in arriving at a purchase price, Plaintiff relied solely on Defendants' expertise and flow of information. (*See id.* ¶ 51).

Defendants sought to manipulate other provisions of the documents to insulate themselves from liability for non-compliance with the contracts and accomplish the overall fraud they were perpetrating on Plaintiff. (*See id.* ¶ 52). For example, each PLSC calls for a "Verification Certificate," or Plaintiff's certification that Defendants have complied with their obligations under the PLSCs, such as Plaintiff receiving from Defendants all information it was supposed to get to make informed decisions regarding the purchases. (*See id.* ¶ 53; Compl. Ex. 1, 12–114; Compl. Ex. 2, 1–145). In at least 11 of the PLSCs, Defendants procured the LSCs after Plaintiff executed the Verification Certificates – in other words, the LSCs did not exist at the time Plaintiff is supposed to have signed off on receiving them. (*See* Compl. ¶ 54).

Despite their contractual obligation to do so, Defendants avoided providing Plaintiff with the underlying LSCs until May 2017, when Plaintiff demanded the policies in writing. (*See id.* ¶ 57; Compl. Ex. 3, 68–71). On October 11, 2017, Plaintiff sent Defendants a written demand for rescission of the 12 PLSCs they tricked Plaintiff into buying at inflated prices. (*See* Compl. ¶ 58). Defendants have refused. (*See id.* ¶ 59).

Plaintiff brings four claims for relief. Count 1 is titled "Rescission," and seeks rescission together with reimbursement of the premium amounts Plaintiff paid on each of the policies to keep them current. (*See id.* ¶¶ 60–64). Count 2 is titled "Fraud," and it demands damages in the

amount overpaid for the 12 PLSCs, together with punitive damages. (*See id.* ¶¶ 65–67). Count 3 is titled "Breach of Fiduciary Duty," and it similarly seeks damages for the amounts overpaid as well as punitive damages. (*See id.* ¶¶ 68–70). Count 4 is for "Breach of Contract," and it seeks damages in the amounts overpaid as a result of Defendants' material breach of the master contract and PLSCs related to the preparation and filling out of Verification Certificates for Plaintiff to sign, without first securing and delivering to Plaintiff the underlying, executed LSCs. (*See id.* ¶¶ 71–74).

**B.    The Motion**

Defendants move to dismiss all counts of the Complaint on the basis Plaintiff fails to state plausible claims for relief. (*See generally* Mot.). In particular, Defendants emphasize certain contractual provisions.

The master agreement between Plaintiff and Q Capital provides that Q Capital would present to Plaintiff "opportunities for the purchase of [p]olicies identified by Provider and believed to satisfy Buyer's Eligibility Requirements." (Compl. Ex. 1, 4 ¶ 1(b) (alteration added)). Each PLSC begins by stating "Buyer hereby directs Provider to purchase the Policy from the Seller for re-sale by Provider to Buyer" and lists the "Acquisition Price [to be paid by Plaintiff] for its purchase of the Policy from Provider." (*Id.* Ex. 2, 2 ¶ 1.1 (alteration added)). The PLSCs provide that Plaintiff, not Defendants, independently determines the Acquisition Price Plaintiff is willing to pay as follows: "Buyer independently determines the elements, methodologies and formulas used in determining whether it will buy any Policy and the price to be paid therefor, based on its own independent analysis and consultation with its financial and actuarial consultants separate from Provider." (*Id.* 6 ¶ 3.1). Each PLSC also states:

> Buyer possesses such business and financial experience as is necessary to properly
> evaluate its purchase of the Policy, and is aware of and has had an opportunity to evaluate

and plan for management of the risks that are associated with such investments, and freely, voluntarily and knowingly accepts all such risks.

(*Id.* 8 ¶ 3.5(c)). Furthermore, "Buyer expressly relies upon its own resources, knowledge, experience and independent advisors in evaluating and analyzing all data and information provided by Provider in connection with the Policy acquired hereunder." (*Id.*).

Defendants also reference material provisions pertaining to the Verification Certificate. (*See generally* Mot.). If Defendants failed to provide the sale documentation material within 90 days after the PLSC was signed, Plaintiff had the absolute right to cancel the PLSC. (*See* Compl. Ex. 2, 4 ¶ 1.5(d)). Defendants place great store in the PLSCs' language that "in the event of any fault, failure or error by Provider in performing its obligations hereunder . . . . Provider's obligations and liabilities shall terminate upon the later of (i) expiration of the Term of this Agreement, or (ii) expiration of six months following the Policy Closing Date." (*Id.* Ex. 2, ¶¶ 2.5, 2.5(b)). The PLSCs are dated during the first half of 2015, and all Policy Closing Dates occurred within a few months thereafter. (*See* Mot. 6 (citing Compl. ¶¶ 20–23)).

With regard to the Verification Certificates, each one contains the following representations:

Buyer hereby irrevocably and unconditionally certifies to Provider that:

1. [The Policy being purchased] satisfies all of Buyer's requirements and is to be acquired, transferred and assigned to Buyer as the new owner and sole beneficiary of said Policy.

2. Buyer has received from Provider the Sale Documentation Package inclusive of each of the required documents listed on the Sale Documentation Package Checklist appended to the Agreement as Schedule Two, which documentation appears to be complete, executed by the relevant signatories thereto (other than Provider, which will execute the Life Settlement Contract and related documents following its receipt of this Verification Certificate), and is hereby accepted as reasonably satisfactory to Buyer.

3. Provider is hereby authorized and directed on behalf of Buyer to complete the purchase of such Policy, and to instruct Buyer (and the Escrow Agent, if applicable) as reasonably necessary in regard to the proper processing, completion and delivery of the Policy Transfer Documentation and consummation of the Policy purchase in accordance with the terms of the Agreement.

(Compl. Ex. 2, 21 (alteration added)).

The parties agree New York substantive law applies, as each PLSC states it is governed by New York law (*see id.* 54 ¶ 7.1), and Plaintiff's pleading confirms the same (*see* Compl. ¶ 10). The Court now turns to the arguments Defendants raise in their effort to secure a dismissal of the Complaint "in its entirety with prejudice." (Mot. 20).

## III. DISCUSSION

### A. Time Bar

Florida courts consider the statute of limitations to be substantive, and so the statute of limitations of the parties' chosen forum applies where there exists a contractual choice of law provision. *See, e.g.*, *Gaisser v. Portfolio Recovery Assocs., LLC*, 571 F. Supp. 2d 1273, 1276 (S.D. Fla. 2008); *see also Wester Grp. Nurseries, Inc. v. Ergas*, 211 F. Supp. 2d 1362, 1366 (S.D. Fla. 2002) ("Generally, Florida enforces choice-of-law provisions as to contractual claims unless the law of the chosen forum contravenes strong public policy." (citation omitted)). Here, the PLSCs all state: "[I]n the event of any fault, failure or error by Provider in performing its obligations hereunder, . . . (b) Provider's obligations and liability shall terminate upon the later of (i) expiration of the Term of this Agreement, or (ii) expiration of six months following the Policy Closing Date." (Compl. Ex. 2, 47–48 ¶ 2.5(b) (alterations added)).

Defendants' first argument is that Plaintiff's claims are time-barred because the parties agreed in the policy purchase agreements that all claims against Defendants concerning any

policy purchase had to be asserted no later than six months after the purchase closed. (*See* Mot. 2, 9–11). The argument and analysis supplied are insufficient to support a dismissal.

First, the quoted provision is not clear. The contract language is silent on when claims regarding the Providers' obligations and liability should be brought. While the language speaks to when the Providers' obligations and liability terminate, it does not state a deadline different from the New York six-year statute of limitations for breach-of-contract claims, *see* N.Y. C.P.L.R. 213(2) (Consol. 2015), filed in a court of law.

Defendants would have the Court construe the language to mean Plaintiff had to bring suit by the dates of termination of the PLSCs or six months following the policies' closing dates, whichever was later, yet, the contract language does not in fact state that. As Plaintiff notes, the contractual provision "limits the period of time within which Defendants will be responsible for their action against Plaintiff, as opposed to being a deadline within which Plaintiff must file a lawsuit[.]" (Resp. 7 (alteration added)). The language is silent on the deadline for bringing a lawsuit, and the Court will not supply the meaning suggested by Defendants for them. *See Smile Train, Inc. v. Ferris Consulting Corp.*, 986 N.Y.S. 2d 473, 474 (N.Y. App. Div. 2014) (stating a contractual provision shortening time for filing claim must "not be so vague and ambiguous that it is unenforcible [sic]" (internal quotation marks and citation omitted)).

Second, on a Rule 12(b)(6) motion, a claim may be dismissed as time-barred under a statute of limitations "only if the factual allegations in the complaint clearly show that the claim is untimely." *St. John's Univ, N.Y. v. Bolton*, 757 F. Supp. 2d 144, 157 (E.D.N.Y. 2010) (citations omitted). In other words, "[f]or a defendant's statute of limitations arguments to succeed, the plaintiff must plead[] itself out of court." *Id.* (first alteration added; internal quotations marks and citation omitted).

Defendants seek to use the contractual provision to bar all of Plaintiff's claims, not just the breach-of-contract claim. They do so without the necessary and rigorous analysis required for dismissal with prejudice, as they request. Indeed, Defendants do not even address whether equitable tolling applies to bar their statute of limitations defense or what effect, if any, the contractually-shortened limitations period they advance would have on a well-pleaded fraud claim or other non-contractual claim. *See, e.g.*, *ITT Corp. v. Lee*, 663 F. App'x 80, 84–85 (2d Cir. 2016) ("A litigant seeking equitable tolling must establish: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." (internal quotation marks and citations omitted)).

### B. Count 2: Fraud Claim

Defendants next challenge the sufficiency of the fraud alleged to support Count 1 for Rescission and Count 2 for Fraud. The Court considers Count 2 before turning to Count 1.

The Court tests the sufficiency of the Complaint's allegations of fraud under the heightened pleading standard of Federal Rule of Civil Procedure 9(b). Under Rule 9(b), "[i]n alleging fraud or mistake, the party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* (alteration added). To comply with Rule 9(b), "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) (citation omitted). Furthermore, where a complaint alleges fraud against more than one defendant, as here, it "must state the allegations specifically attributable to each individual defendant." *Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 258 (S.D.N.Y. 2008) (citations omitted).

The fraud claim stated in Count 2 is that Defendants "made material misrepresentations of facts to Plaintiff, both directly and implicitly through Shapiro and Meulemans, which Defendants intended to and which did in fact justifiably induce Plaintiff into grossly overpaying on the twelve PLSCs[.]" (Compl. ¶ 66 (alteration added)). As Defendants observe, Plaintiff fails to identify a single statement alleged to be a misrepresentation of material fact, set out the particulars of any such statement, and indicate who uttered it, to whom, and when. (*See* Mot. 12). Defendants acknowledge Plaintiff elaborates on an example of the fraud, that is, that "The 8th and Shapiro would counsel and advise Plaintiff that the price that Plaintiff had arrived at to purchase a specific policy was not high enough to prevail at an auction all the time knowing that such price was already much higher . . . than the price Defendants knew would be successful at auction . . . ." (*id.* 12–13 (quoting Compl. ¶ 39)), while also noting Plaintiff fails to indicate who made the misrepresentation, what was said and to whom (*see id.* 13).

Undeterred by the specificity it acknowledges it is required to comply with (*see* Resp. 8), Plaintiff insists it has sufficiently pleaded its fraud claim (*see id.* 9). In the event it has not done so, Plaintiff also suggests "less specificity is permissible in the context of the type of the elaborately sustained continuous charade, covering multiple transactions over a period of several months, as set forth . . . in the Complaint." (*Id.* (alteration added) (citing cases)).

As Defendants correctly note in their Reply, the three cases Plaintiff relies on to circumvent the requirements of Rule 9(b) have no application here, or compel a different result than that urged by Plaintiff. (*See* Reply 6–7). *See, e.g.*, *Lavastone Capital LLC v. Coventry First LLC*, Nos. 14–cv–7139, 14–cv–7967 (JSR), 2015 WL 1939711, at *8 (S.D.N.Y. Apr. 22, 2015) (noting "the allegations (relating to a phone call and an email) are sufficient to withstand such heightened pleading requirements, because Lavastone identifies the speaker (Alan Buerger),

provides the dates that [] Alan Buerger made [the] phone call and sent the email to Lavastone, and provides a context that explains why the statements were allegedly fraudulent" (alterations added)). Putting aside the many descriptive terms interspersed throughout the Complaint, including an "elaborate" yet "simple" "scheme to defraud" (Compl. ¶ 38); "sham playacting" (*id.* ¶ 46); and contracts serving as "props to camouflage" (*id.* ¶ 50), Plaintiff fails to identify the specific statements it contends were fraudulent, identify the speakers, state where and when the statements were made, and explain why each of the statements was fraudulent. *See Mills*, 12 F.3d at 1175. Generally stating Defendants "flimflam[med]" Plaintiff into paying more than it should have for the PLSCs "through misrepresentations, omissions, and half-truths" (Compl. ¶ 12 (alteration added)), and providing generalized examples and a description of how the scheme worked, do not satisfy Rule 9(b).

Consequently, Count 2 is dismissed with leave to amend.

### C. Count 1: Rescission Claim

The parties' arguments with respect to the sufficiency of Count 1, for rescission, appear to dart past each other. Defendants set up the discussion by observing New York law views rescission as an extraordinary equitable remedy, only available where a party alleges "fraud in the inducement of a contract; failure of consideration; an inability to perform the contract after it is made; or a breach in the contract which substantially defeats the purpose thereof." (Mot. 16 (quoting *Babylon Assocs. v. Suffolk Cty.*, 475 N.Y.S. 2d 869, 874 (N.Y. App. Div. 1984)). Defendants then state Plaintiff's rescission "claim is decidedly not for fraud in the inducement." (*Id.* 17).

Not so, for apparently it is. Plaintiff states in its Response the basis for its rescission claim is "that Plaintiff was fraudulently induced by" Defendants to enter into the referenced contracts. (Resp. 18). Plaintiff describes,

> Defendants and their agent, The 8th, from inception, engineered an elaborate scam against Plaintiff where they pretended to be engaged in a real-time, ongoing competitive auction process, which in effect they never did. This playacting engagement that commenced at the earliest point of the relationship between the Parties, constituted the requisite misrepresentation required to sustain a claim of fraud in the inducement.

(*Id.* (citing Compl. ¶¶ 39, 40, 41–47)). Because its rescission claim is "based on a fraud in the inducement" (*id.*), Plaintiff insists it should not be dismissed.

In their Reply, having been disabused of their assumption Count 1 did not rely on a fraud in the inducement, Defendants simply announce, Plaintiff does "not attempt to plead a fraud *in the inducement* claim." (Reply 9 (emphasis in original)). It is unclear why Defendants reach this conclusion given Plaintiff's contrary statements in its Response. As Defendants maintain Plaintiff does not sufficiently plead a fraud claim, they rely on the briefing of the requirements of a general fraud claim contained in their Motion. (*See id.*).

Notwithstanding the non-elucidating briefing by the parties, Count 1 with its "claim" for rescission is due to be dismissed. This is because "[r]escission is only a remedy, not a cause of action." *Zola v. Gordon*, 685 F. Supp. 354, 374 (S.D.N.Y. 1988) (alteration added; citations omitted). Titling a discrete count in the Complaint "Rescission" is not unlike titling a free-standing count "Damages." Furthermore, to the extent Plaintiff's "claim" for rescission rests on the fraud-in-the-inducement claim stated in Count 2, its failure to properly plead fraud with the required specificity is also the "death knell" of its so-called rescission claim. *Barnett v. Countrywide Bank, FSB*, 60 F. Supp. 3d 379, 394 (E.D.N.Y. 2014) (citation omitted). To be

clear, when Plaintiff files an amended complaint with the specificity required for its fraud claim, it is not to include within it a cause of action entitled "Rescission."

### D.     Count 3: Breach of Fiduciary Duty Claim

Plaintiff alleges Defendants owed it a fiduciary duty, which they breached by engaging in the scheme to defraud it into grossly overpaying for the 12 PLSCs; this breach of fiduciary duty "involves a fraud evincing a high degree of moral turpitude." (Compl. ¶¶ 67, 70). According to Defendants, Plaintiff cannot state a claim for breach of fiduciary duty regarding the pricing of the policies acquired because they never agreed to assume any duty to Plaintiff regarding policy pricing, let alone a fiduciary duty. (*See* Mot. 18). In this regard, Defendants rely on the PLSCs, which are, on their face, arm's-length contracts, and the quoted language that Plaintiff "relies upon its own resources, knowledge, experience and independent advisors in evaluating and analyzing all data and information provided by Provider in connection with the Policy acquired hereunder." (Compl. Ex. 2, 50 ¶ 3.5(c)). Furthermore, and on point, Plaintiff agreed to "independently determine[] the elements, methodologies and formulas used in determining whether it will buy any Policy and the price to be paid therefor, based on its own independent analysis and consultation with its financial and actuarial consultants separate from Provider." (*Id.* 89 ¶ 3.1 (alteration added)).

Plaintiff insists "there was no arms-length transaction." (Resp. 14). Plaintiff states, "Defendants and The 8th held themselves out to be experts in the niche field of life insurance settlement and [] Plaintiff was a neophyte in this area . . . exclusively relying on their joint expertise[,]" and the contracts were "props to camouflage the fact that the Plaintiff was clearly 100% reliant on Defendants." (*Id*. 14–15 (alterations added; internal quotation marks and citation omitted)). Plaintiff cites New York law which requires courts look beyond the terms of

a contract to ferret out the true nature of a relationship. (*See id.* 15 (citing *Riddell Sports v. Brooks*, No. 92 Civ. 7851 (JGK), 1997 U.S. Dist. LEXIS 4394, at *31 (S.D.N.Y. Jan. 7, 1997); *Lavastone Capital One LLC v. Coventry First LLC*, 14-cv-7139 (JSR), 2015 U.S. Dist. LEXIS 56855, at *29–32 (S.D.N.Y. Apr. 21, 2015))).

To state a claim of breach of fiduciary duty, a plaintiff must allege "(1) the existence of a fiduciary duty, (2) a knowing breach of that duty, and (3) damages resulting from the breach." *Mueller v. Michael Janssen Gallery Pte. Ltd.*, 225 F. Supp. 3d 201, 205 (S.D.N.Y. 2016) (footnote call number and citation omitted). A fiduciary relationship depends on: "(1) [t]he vulnerability of one party to the other which (2) results in the empowerment of the stronger party by the weaker which (3) empowerment has been solicited or accepted by the stronger party and (4) prevents the weaker party from effectively protecting itself." *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 214–15 (S.D.N.Y. 2007) (alteration in original; internal quotation marks, footnote call number, and citation omitted). While a "fiduciary relation exists between two persons when one of them is under a duty to act or give advice for the benefit of the other upon matters within the scope of the relation," *Bank of Am. Corp. v. Lemgruber*, 385 F. Supp. 2d 200, 224 (S.D.N.Y. 2005) (internal quotation marks and citation omitted), "[a]dvice alone . . . is not enough to impose a fiduciary duty," *EBC I, Inc. v. Goldman Sachs & Co.*, 936 N.Y.S. 2d 92, 96 (N.Y. App. Div. 2011) (alterations added; citations omitted). And "where parties deal at arms-length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship [] arise[s] absent extraordinary circumstances." *Manhattan Motorcars, Inc.*, 244 F.R.D. at 215 (internal quotation marks, citation, and footnote call number omitted).

Plaintiff fails to satisfy pleading a plausible fiduciary relationship with Defendants. First, there is nothing in the pleading beyond the conclusory denial of an arm's-length transaction to describe anything other than a commercial transaction between several parties. Significantly, Plaintiff nowhere pleads facts showing Defendants are the "stronger" of the parties, beyond a description of Defendants' expertise in the area of life settlement contracts. *Id.* at 214. Fatal to the creation of a fiduciary relationship are the express terms of the quoted contractual provisions, which negate Defendants agreed to take on the role of advisors in guiding Plaintiff on the prices it would or should pay for the policies acquired.

Finally, Plaintiff does not state the empowerment it describes in the pleading was "solicited or accepted by the stronger party," *id.* at 214–15 (internal quotation marks, footnote call number, and citation omitted), presumably, Defendants. Certainly, a "fiduciary duty cannot be imposed unilaterally." *Mueller*, 225 F. Supp. 3d at 206 (internal quotation marks and citation omitted); *see also Russell Pub. Grp., Ltd. v. Brown Printing Co.*, No. 13 CIV. 5193 (SAS), 2014 WL 1329144, at *3 (S.D.N.Y. Apr. 3, 2014) ("[R]eposing trust or confidence in a party that has superior access to confidential information is not sufficient to establish a fiduciary relationship – under New York law, there is no fiduciary duty unless the trust or confidence has been accepted as well." (internal quotation marks, citation and footnote call number omitted; alteration added)). It does not describe how any empowerment, if there was such, prevented Plaintiff as the purportedly weaker party "from effectively protecting itself." *Manhattan Motorcars, Inc.*, 244 F.R.D. at 215 (internal quotation marks, footnote call number, and citation omitted). As Plaintiff describes it, after signing the master contract, far from establishing a fiduciary relationship with Defendants, the "very first PLSC that Plaintiff did with either Defendant[] was . . . particularly egregious" (Compl. ¶ 42 (alterations added)), as it involved a policy The 8th had previously

purchased and which Defendants together with The 8th decided to resell — rather than bid for at auction — for an immediate and inflated profit without informing Plaintiff of this background information (*see id.* ¶¶ 44–46).

Plaintiff's claims it was 100 percent reliant on Defendants do not take it so far as to create a plausible allegation of a fiduciary relationship. Consequently, Count 3 is dismissed.

### E.      Count 4: Breach of Contract Claim

Defendants argue Plaintiff cannot state a claim for breach of contract for Defendants' alleged failure to provide the LSCs given: (1) the final, irrevocable and unconditional certifications Plaintiff signed certifying it had all the documentation it required to proceed to closing; and (2) Plaintiff authorized and directed Defendants to proceed to closing on the purchases on the basis of those certifications. (*See* Mot. 16). In support of their argument, Defendants cite a single case, *C.K. Rehner, Inc. v. Bd. of Educ. of City of N. Y.*, 373 N.Y.S. 2d 132 (N.Y. App. Div. 1975), which addressed the propriety of summary judgment where the plaintiff agreed accepting the defendant's final payment would operate as a full and complete release. (*See* Mot. 15). *C.K. Rehner, Inc.* is hardly helpful to explaining why Plaintiff fails to state a claim of breach of contract on the basis of signed Verification Certificates.

According to Plaintiff, the underlying LSCs did not physically exist on the occasions it executed the corresponding Verification Certificates. (*See* Compl. ¶¶ 54–55; *see also* Resp. 19). Plaintiff alleges Defendants did not timely supply it with certain key documents they were contractually required to provide, and so while the signed Verification Certificates may cast doubt on the allegation, Plaintiff maintains it was tricked into signing the Certificates, which were unaccompanied by the documentation Defendants were contractually required to present to Plaintiff. (*See* Compl. ¶ 55).

A claim of breach of contract requires a plaintiff allege the existence of an agreement, a plaintiff's adequate performance of the contract, a breach by the defendant, and damages. *See Cohen v. LTF Real Estate Co., Inc.*, No. 08–CV–4591 (JTB) (ARL), 2009 WL 1373542, at *3 (E.D.N.Y. May 15, 2009) (citation omitted). "Conclusory allegations that a defendant breached an agreement are insufficient to support a breach of contract claim." *Frontline Processing Corp. v. Merrick Bank Corp.*, No. 13 CIV. 3956, 2014 WL 837050, at *2 (S.D.N.Y. Mar. 3, 2014).

At its core, the breach-of-contract claim is predicated upon the allegation Plaintiff was tricked into signing Verification Certificates that were unaccompanied by the documentation Plaintiff expected to see, and consequently and notwithstanding the contrary written verifications, Defendants did not provide Plaintiff with the contractually-required documentation for the PLSCs. This "I-was-tricked-into-signing" allegation is purely conclusory; no facts describe how the trickery regarding approving non-existent documentation was accomplished. Thus, in the face of signed Verification Certificates the Court is allowed to consider on this Rule 12(b)(6) Motion, Plaintiff is required to plead facts supporting the bare allegation of trickery in order to state a plausible breach-of-contract claim.

Count 4 is dismissed with leave to amend.

## F. Punitive Damages

Defendants argue punitive damages are not recoverable as a matter of law, because "a private party seeking to recover punitive damages must not only demonstrate egregious tortious conduct by which he or she was aggrieved, but also that such conduct was part of a pattern of similar conduct directed at the public generally." (Mot. 19 (quoting *Rocanova Equitable Life Assur. Soc. of U.S.*, 634 N.E.2d 940, 944 (N.Y. 1994)). In its Response, Plaintiff does not address this argument at all. Consequently, the requests for the award of punitive damages are

stricken. *See, e.g.*, *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned, and affirming grant of summary judgment, as to claim presented in complaint but not raised in initial response to motion for summary judgment).

## IV. CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Defendants, Q Capital Strategies, LLC and Life Settlement Solutions, LLC's Motion to Dismiss Complaint Pursuant to Rule 12(b)(6) **[ECF No. 14]** is **GRANTED in part** and **DENIED in part**. Plaintiff has until January 18, 2018 to file an amended complaint.

**DONE AND ORDERED** in Miami, Florida, this 3rd day of January, 2018.

_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record