UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-23902-CIV-ALTONAGA/Goodman

**CDG INTERNATIONAL CORP.**,

    Plaintiff,
v.

**Q CAPITAL STRATEGIES, LLC** and
**LIFE SETTLEMENT SOLUTIONS, LLC**,

    Defendants.
_____/

## ORDER

**THIS CAUSE** came before the Court on Defendants, Q Capital Strategies, LLC and Life Settlement Solutions, LLC's Motion for Summary Judgment [ECF No. 49], submitted contemporaneously with their Statement of Undisputed Material Facts ("Defendants' SMF") [ECF No. 50], filed on July 3, 2018. Plaintiff, CDG International Corporation, filed a Memorandum of Law in Opposition [ECF No. 57]; along with a Response ("Plaintiff's SMF") (*see* [ECF No. 58] 1–9), and Counterstatement of Material Facts ("Plaintiff's CMF") (*see id.* 9–10). On July 27, 2018, Defendants filed a Reply [ECF No. 61] to the Opposition, and a Reply to Counterstatement of Material Facts ("Reply to CMF") [ECF No. 62]. The Court has carefully considered the briefing and its exhibits, the record, and applicable law.

### I.     BACKGROUND

**A. The Parties**

CDG is owned by Cartiere di Guarcino S.p.A. ("CDG S.p.A."), an Italian company in the decorative paper products and furniture business. (*See* Defs.' SMF ¶ 1 (undisputed)). Until September 2017, CDG S.p.A. was owned by Finanziaria Valentini ("the Valentini group"), a

private holding company that owned a group of affiliated companies. (*See id*. ¶ 2 (undisputed)). In September 2017, CDG S.p.A. was restructured under a new parent company, Neodecortesh S.p.A., at which time 27% of its shares became publicly traded on the Italian stock exchange, while 73% of the shares remained owned by the Valentini group. (*See id*.).

Q Capital Strategies is a licensed life settlement provider that engages in the purchase, sale and servicing of senior life insurance policies in the direct, secondary and tertiary markets for life settlements. (*See id*. ¶ 14 (undisputed)). Q Capital Strategies was founded by its President and Chief Executive Officer, Steven Shapiro. (*See* Deposition of Q Capital Strategies, LLC, by and through its President Steven Shapiro ("Shapiro Deposition") [ECF No. 59-3] 9:6–22, 10:10–13).

Q Capital Holdings — the holding company that owns Q Capital Strategies — purchased Life Settlement Solutions in 2013. (*See id*. 9:15–22). Because Life Settlement Solutions has a license to operate in some states and Q Capital Strategies has a license to operate in others, the entities have been maintained separately by Q Capital Holdings. (*See id*. 9:15–10:1; *see also* Defs.' SMF ¶ 14 n.2). Shapiro described the role of Q Capital and Life Settlement as that of "a required party or company . . . in a secondary market transaction" (Shapiro Dep. 57:10–11 (alteration added)), explaining his companies "work with various parties, brokers, agents, et cetera to identify policies that are available for sale and to work with funders to match policies with funders' criteria" (*id.* 57:13–16).

### B. The Formation of CDG

In early 2015, the Valentini group was looking for bank financing of € 9–10 million to carry out investments and sustain working capital. (*See* Defs.' SMF ¶ 4 (undisputed)). The Valentini group researched financial institutions within its own network and with outside

professionals. (*See id*.). The Valentini group's research led it to Banque International à Luxembourg ("BIL"), a leading private bank in Luxembourg, and to James Meulemans, a European financial consultant with contacts at BIL. (*See id*. ¶ 5 (undisputed)).

Meulemans facilitated a meeting for the Valentini group with representatives of BIL regarding the € 9–10 million loan. (*See id*. ¶ 6 (undisputed)). Defendants cite to the deposition of Massimo Giorgilli ("Giorgilli Deposition") [ECF No. 49-1], stating the Valentini group "retained Meulemans 'to move forward with all discussion with the bank to secure the loan, the financing' and appointed Meulemans as the Valentini [group's] 'exclusive intermediary' with BIL and the loan origination in that regard." (*Id*. ¶ 7 (alteration added) (quoting Giorgilli Dep. 39:14–20, 43:10–19)). These comments have been amended by Giorgilli through an errata sheet dated June 21, 2018 (*see* Pl.'s SMF ¶ 7 (citing Giorgilli Errata Sheet [ECF No. 59-1] 119)); Plaintiff clarifies the negotiations between BIL and Plaintiff were conducted by Plaintiff — Meulemans was a facilitator and was an exclusive intermediary with BIL only with respect to the interaction by third parties with BIL on Plaintiff's behalf (*see id*.).

In February or March of 2015, the Valentini group had two meetings, facilitated by Meulemans, with BIL representatives. (*See* Defs.' ¶ 8 (undisputed)). In the meetings, BIL and the Valentini group reached an understanding that BIL would accept as collateral for the desired € 9–10 million loan a portfolio of life insurance policies with life expectancies in the range of 10 to 12 years and a total face value of death benefit of around $15 million. (*See id*. ¶ 9 (undisputed)). As a result, the Valentini group formed Plaintiff for the single purpose of owning a portfolio of life insurance policies to serve as collateral for a commercial loan. (*See id*. ¶¶ 1, 10 (undisputed)).

**C. The Parties' Business Relationship**

At the same time, the Valentini group began to search for a life settlement provider to help put together Plaintiff's portfolio of policies to collateralize the loan from BIL. (*See id*. ¶ 10 (undisputed)). The Valentini group considered portfolios offered by another licensed life settlement provider — Coventry — but on the advice of Meulemans, decided not to acquire the policies from Coventry to collateralize the BIL loan. (*See id*. ¶ 12 (citing Giorgilli Dep. 43:21–51:18)). As early as February 8, 2015, Meulemans worked with Steven Vanderhoydonks[1] and Defendants to present Plaintiff with a competitive portfolio of life settlement products. (*See* Pl.'s SMF ¶ 12 (citing Emails [ECF No. 58-1] Exs. 1–7)). Meulemans then introduced the Valentini group to Defendants (*see* Defs.' SMF. ¶ 13 (undisputed)), at which time the Valentini group decided Plaintiff would enter a business relationship with Defendants to assemble a portfolio of life insurance policies for Plaintiff (*see id*. ¶ 15 (undisputed)). On February 19, 2015, Meulemans reported to Vanderhoydonks and Shapiro that the Valentini group had selected Defendants as Plaintiff's life settlement providers. (*See* Emails Ex. 9 QC0005434).

On February 26, 2015, Plaintiff and Defendants executed a Mutual Confidentiality Agreement and Covenant of Compliance [ECF No. 50-3]. (*See* Defs.' SMF ¶ 15 (undisputed)). The Mutual Confidentiality Agreement specified eligibility requirements defining the types of policies Plaintiff was interested in acquiring. (*See id*. ¶ 16). The Mutual Confidentiality Agreement states Defendants would "present to Buyer [Plaintiff] opportunities for purchase of Policies identified by Provider[s] and believed to satisfy Buyer's Eligibility Requirements," at which time Plaintiff would decide whether to purchase the policies identified by Defendants. (Mutual Confidentiality Agreement ¶ 1(b) (alterations added)). According to the Mutual

---

[1] Steven Vanderhoydonks was another European financial consultant working with Meulemans. (*See* Defs.' SMF ¶ 19).

Confidentiality Agreement, once Plaintiff decided to purchase a policy identified by Defendants, the parties would execute a separate purchase agreement for the purchase of that policy. (*See* Defs.' SMF ¶ 17 (citing Mutual Confidential Agreement ¶ 1(b))). At the same time, Plaintiff also executed a Client Profile [ECF No. 50-4], representing itself as a sophisticated and accredited investor and acknowledging certain investment risks. (*See id*. ¶ 18 (undisputed)).

At this time, neither Meulemans nor Vanderhoydonks was representing Plaintiff, nor were they retained or engaged by Plaintiff as consultants or advisors in connection with acquiring life settlement contracts with Defendants or otherwise. (*See* Pl.'s CMF ¶ 3). Defendants, Meulemans, and Vanderhoydonks had a fee-splitting agreement between them, wherein they would divide up the difference between the "Bid Price" of the policy and the "Purchase Price" of the policy. (*See id*. ¶¶ 5, 8 (citing Shapiro Dep. 61:10–63:18, 80:10–89:23, 93:21–95:24, 143:25–149:10; *see also* Emails Exs. 7 & 9)). Plaintiff had no knowledge of the fee-splitting arrangement. (*See id*. ¶ 6 (citing Shapiro Dep. 23:7–15, 85:19–23; Giorgilli Dep. 74:15–75:23)).

On April 27, 2015, Francesca Terrinoni, Plaintiff's representative, responded to an email from Shapiro, copying Meulemans and Vanderhoydonks, in which she stated, "I would appreciate if you could update me about policies." (April 2015 Email Chain [ECF No. 49-11] QC0005243). Meulemans responded to Terrinoni's email, copying Shapiro and Vanderhoydonks, stating "[a]ll updates are coming from our side, Steven [Vanderhoydonks,] Aelis and me." (*Id*. QC0005242 (alteration added)). Meulemans then emailed Shapiro stating, "I do not want [Plaintiff] to contact you directly;" to which Shapiro responded, "Not a problem." (*Id*. (alteration added)).

### D. Plaintiff's Purchase of the Policies

In total, Plaintiff purchased 12 of the many policies presented to it. (*See* Defs.' SMF ¶ 20). Recommendations and details about purchase offers were all conveyed to Defendants by Vanderhoydonks. (*See id*. (citing Giorgilli Dep. 78:5–25; Emails Ex. 5, QC0008391, Ex. 6, QC0003799)). In these 12 instances, Plaintiff and Defendants executed separate Agreements for Purchase of In-Force Life Insurance Policy ("Purchase Agreements") [ECF No. 50-7[2]], each of which followed the same form. (*See id*. ¶ 21 (undisputed)).

Through the Purchase Agreements, Defendants agreed to purchase each policy from the seller for re-sale to Plaintiff; each Purchase Agreement lists the Purchase Price Plaintiff will then pay to Defendants for purchasing each policy. (*See id*. ¶ 22 (undisputed)). The Purchase Price (identified as the "Acquisition Price" in the Purchase Agreements) consisted of (1) the amount to be paid to the seller of the policy; (2) the commission to be paid to the seller's broker; and (3) the remaining balance covering origination fees to be received by Defendants in addition to transaction costs, escrow fees, and any other payments Defendants were required to disburse in relation to the transaction. (*See id*. ¶ 23 (undisputed)).

The Purchase Agreements state Plaintiff will "independently determine[] the elements, methodologies and formulas used in determining whether it will buy any Policy and the price to be paid therefor, based on its own independent analysis and consultation with its financial and actuarial consultants separate from [Defendants]." (Purchase Agreement ¶ 3.1 (alterations added)). Furthermore, the Purchase Agreements state Plaintiff "possesses such business and financial experience as is necessary to properly evaluate its purchase of [each] Policy, and . . . voluntarily and knowingly accepts all [the associated] risks." (*Id*. ¶ 3.5(c) (alterations added)).

---

[2] Defendants entered a copy of one of the Purchase Agreements as an exhibit to Defendants' SMF. (*See* Defs.' SMF 5 n.3). All 12 Purchase Agreements are attached as exhibits to Plaintiff's Amended Complaint [ECF No. 30]. (*See* Purchase Agreements [ECF Nos. 30-2 through 30-13]).

The Purchase Agreements also state Plaintiff "rel[ies] []on its own resources, knowledge, experience, and independent advisors in evaluating and analyzing all data and information provided by [Defendants] in connection with the Policy acquired." (*Id*. (alterations added)).

Plaintiff claims the bidding information it was provided was not accurate, and none of the bids Plaintiff instructed Defendants to make through Meulemans and Vanderhoydonks was made for the amount authorized. (*See* Pl.'s SMF ¶ 20). As a result, Plaintiff believes its independent analysis was tainted by the false information provided by Vanderhoydonks and Meulemans. (*See id.* ¶ 26 (citing Giorgilli Dep. 83:8–86:12, 98:5–99:25)).

Defendants state they were not parties to or aware of the substance of the pricing discussions between Vanderhoydonks, Meulemans, and Plaintiff. (*See* Defs.' SMF ¶ 27 (citing Emails Exs. 11–12)). Instead, Defendants claim that for each policy Plaintiff directed Defendants to purchase, Plaintiff communicated the Purchase Price to Vanderhoydonks, who, in turn, provided the Purchase Price to Defendants. (*See* Defs.' ¶ 28 (citing Emails Ex. 13–15)). In contrast, Plaintiff points to a partially redacted e-mail chain as evidence Defendants were aware of pricing discussions, stating "Shapiro[] immediately acknowledge[d] receipt of [an] email" and "prepare[d] . . . purchase contracts at the inflated purchase price, despite knowing [Defendants] had previously secured the underlying policies for a fraction of the stated price it knew [Plaintiff] was told it was paying." (Pl.'s SMF ¶ 27 (alterations added) (citing Emails Ex. 20)).

Plaintiff did not receive the life settlement contracts showing the Bid Prices paid by Defendants to the policy sellers until years after the transactions closed. (*See* Defs.' SMF ¶ 32 (citing Giorgilli Dep. 90:20–91:6)). Defendants assert Plaintiff never asked Defendants for the contracts during those years, and Defendants provided the contracts when asked. (*See id*.). Giorgilli testified Plaintiff asked Meulemans for the amounts paid to purchase the life insurance

policies (*see* Giorgilli Dep. 92:24–93:1), but did not ask for the contracts because Defendants "didn't know these contracts existed" (*id*. 92:23–24); nor did Plaintiff know Defendants provided the sale documentation materials to Vanderhoydonks and Meulemans (*see id*. 93:19–24).

### E. The BIL Loan

While the parties agree BIL accepted the portfolio of policies assembled by Plaintiff as collateral (*see* Defs.' SMF. ¶ 33 (citing Giorgilli Dep. 103:9–13); *see also* Pl.'s SMF ¶ 33), Plaintiff contends the policies were not sufficient collateral for the loan the Valentini group was pursuing (*see* Pl.'s SMF ¶ 33 (citing Emails Ex. 41)). Regardless, the loan did not close. (*See* Defs.' SMF ¶ 34 (undisputed)). As a result of the loan not closing, Plaintiff decided to sell the portfolio of policies. (*See id*. ¶ 35 (undisputed)). Plaintiff received several purchase offers for the portfolio but declined to accept them, and it did not sell the portfolio of life insurance policies. (*See id*. ¶ 36 (undisputed)). Plaintiff did not accept the offers for the portfolio because it would have resulted in a loss of roughly $700,000. (*See* Giorgilli Dep. 105:18–24).

### F. The Claims

Plaintiff filed its Complaint [ECF No. 1] on October 24, 2017. Defendants portray Plaintiff as having filed a lawsuit "out of the blue," accusing Defendants of having defrauded Plaintiff into overpaying life insurance policies. (Defs.' SMF ¶ 37 (citation omitted)). Plaintiff states it found out in May 2017 that it had been defrauded into vastly overpaying the policies it purchased from Defendants. (*See* Pl.'s SMF ¶ 37). The Court dismissed Plaintiff's Complaint without prejudice on January 3, 2018. (*See* January 3, 2018 Order [ECF No. 27]). On January 25, 2018, Plaintiff filed an Amended Complaint stating claims of fraud (Count I), and conspiracy to defraud (Count II). (*See generally* Am. Compl.).

## II. LEGAL STANDARD

Summary judgment may only be rendered if the pleadings, discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a), (c). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The Court draws all reasonable inferences in favor of the party opposing summary judgment. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000). If the non-moving party bears the burden of proof at trial, the moving party may obtain summary judgment simply by: (1) establishing the nonexistence of a genuine issue of material fact as to any essential element of a non-moving party's claim, and (2) showing the Court that there is not sufficient evidence to support the non-moving party's case. *See Blackhawk Yachting, LLC v. Tognum Am., Inc.*, No. 12-14209-CIV, 2015 WL 11176299, at *2 (S.D. Fla. June 30, 2015) (citations omitted). "Once the moving party discharges its initial burden, a non-moving party who bears the burden of proof must cite to . . . materials in the record or show that the materials cited do not establish the absence or presence of a genuine dispute." *Id*. (citing Fed. R. Civ. P. 56(c)(1)) (alteration added; internal quotation marks omitted).

Where the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial, summary judgment is warranted "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, "[i]f

reasonable minds might differ on the inferences arising from undisputed facts, then the Court should deny summary judgment" and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, No. 1:12-CV-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (alteration added; citations omitted).

### III.   ANALYSIS[3]

Defendants seek summary judgment on the two remaining claims, arguing (1) the fraud claim in Count I cannot survive because Plaintiff provides no evidence Vanderhoydonks and Meulemans acted as Defendants' agents; and (2) the conspiracy claim in Count II cannot survive because Plaintiff provides no evidence of a corrupt agreement between Defendants, Meulemans, and Vanderhoydonks. (*See generally* Mot.; Reply). Plaintiff insists there are genuine issues of fact that make it inappropriate to grant summary judgment on either Count I or Count II. (*See generally* Opp'n). The Court agrees with Plaintiff and explains its reasoning with respect to each count in turn.

#### A. Count I (Fraud)

Under New York law, "an agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act." *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 110 (S.D.N.Y. 2009) (internal quotation marks and citation omitted). "Such authority to act for a principal may be actual or apparent." *Id*. (internal quotation marks and citation omitted). Apparent authority arises from "written or spoken words or any other conduct of the principal which, reasonably interpreted, causes a third person to believe [] the principal consents to have an act done on his behalf by the person purporting to act for him." *Minskoff v. Am. Express Travel Related Servs.*

---

[3] The parties agree New York law applies. (*See* Mot. 11 n.4; *see generally* Opp'n).

*Co., Inc.*, 98 F.3d 703, 708 (2d Cir. 1996) (alteration added). Thus a principal can only be held liable for the acts of an agent under an apparent authority theory if the principal is responsible for the appearance of authority in the agent. *See Meisel*, 651 F. Supp. 2d at 110.

Defendants argue Plaintiff fails to present sufficient evidence to establish apparent authority. (*See* Mot. 11–19; Reply 2–9). In its Opposition, Plaintiff points to an April 2015 Email Chain as a "smoking gun," and offers it as a basis for apparent authority. (*See* Opp'n 13–17).

A principal may be found to convey apparent authority if its "intentional or negligent acts, including acts of omission, create[] an appearance of authority in the agent." *Hidden Brook Air, Inc. v. Thabet Aviation Int'l, Inc.*, 241 F. Supp. 2d 246, 264 (S.D.N.Y. 2002) (alteration added; internal quotation marks and citation omitted). Plaintiff argues Defendants' repeated inaction conveyed apparent authority. (*See* Opp'n 14 (citing *Moog v. Hilton Hotels Corp.*, 882 F. Supp. 1392, 1398 (S.D.N.Y. 1995); *Hidden Brook Air, Inc.*, 241 F. Supp. 2d at 264)). Specifically, in an April 2015 Email Chain; Plaintiff's representative responded to an email from Shapiro, copying Meulemans and Vanderhoydonks, and asked for an "update . . . about policies" (April 2015 Email Chain QC0005243), but Shapiro did not answer (*see generally id*.). Shapiro also remained silent after being copied on Meulemans' response, in which Meulemans stated "[a]ll updates are coming from our side, [Vanderhoydonks] and me." (*Id*. QC0005242 (alterations added)). Plaintiff argues the lack of response or omission by Shapiro made it "reasonable for Plaintiff to believe that Meulemans and Vanderhoydonks were acting with [Defendants'] apparent authority and in [their] stead" by providing updates to Plaintiff that were owed by Defendants. (Opp'n 15 (alterations added)).

Defendants do not cite to any cases holding the omission of a principal is insufficient to

show apparent authority. (*See generally* Reply). Instead, Defendants argue since Plaintiff entered into its business relationship with Defendants in February 2015, it could not have inferred Shapiro's silence in an April 2015 Email Chain was an indication Vanderhoydonks and Meulemans were Defendants' agents when it entered into a business relationship with Defendants. (*See id.* 7–8 (citing *Reiss v. Societe Centrale de Groupe des Assurances Nationales*, 246 F. Supp. 2d 273 (S.D.N.Y. 2003))). Defendants' argument somewhat misses its mark.

Plaintiff did execute a Mutual Confidentiality Agreement with Defendants on February 26, 2015. (*See* Defs.' SMF ¶ 15 (undisputed)). Obviously, Plaintiff could not have been influenced by the April 2015 Email Chain at the time it entered into the Mutual Confidentiality Agreement with Defendants. That is not the relevant inquiry. Instead, the question is whether Plaintiff could have inferred Vanderhoydonks and Meulemans were Defendants' agents at the time it entered into a series of 12 Purchase Agreements. Most of the Purchase Agreements were signed in May 2015 (*see* Purchase Agreements [ECF Nos. 30-5 to 30-9, 30-12 & 30-13[4]] at 21); thus, Plaintiff could have inferred from the April 2015 Email Chain that Vanderhoydonks and Meulemans were Defendants' agents for the bulk of the Purchase Agreements.

Even if Defendants are correct to question the timing of the April 2015 Email Chain as it relates to the parties' initial Purchase Agreements, Defendants' general lack of communication with Plaintiff could itself be evidence of apparent authority. (*See* Opp'n 14–15). Plaintiff asserts apparent authority "may arise absent any direct contact between the principal and the third party . . . by permitting or requiring the agent to serve as the third party's exclusive channel of communication to the principal." (*Id.* 14–15 (quoting *Korea Trade Ins. Corp. v. Oved Apparel Corp.*, No. 13-CV-07918 DAB, 2015 WL 1345812, at *3 (S.D.N.Y. Mar. 23, 2015) (alteration

---

[4] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

added; internal quotation marks and citations omitted))). Defendants do not address the holding in *Korea Trade* or provide authority to the contrary. (*See generally* Reply). The Court therefore considers whether there is sufficient evidence Defendants permitted or required Vanderhoydonks and Meulemans to serve as Defendants' exclusive channel of communication to Plaintiff.

Defendants admit it was always Vanderhoydonks and Meulemans who provided Plaintiff with Purchase Prices for the life insurance policies. (*See* Defs.' SMF ¶ 26 (citations omitted)). Furthermore, when Meulemans emailed Shapiro stating, "I do not want [Plaintiff] to contact you directly," Shapiro responded, "Not a problem." (April 2015 Email Chain QC 0005242 (alteration added)). While Defendants argue the April 2015 Email Chain is evidence Meulemans was making sure Defendants did not "edge in on his relationship with his client" (Reply 5), Shapiro's response could be interpreted as permitting Vanderhoydonks and Meulemans to serve as Defendants' exclusive channel of communication to Plaintiff.

Together, Shapiro's failure to clarify to Plaintiff the nature of Vanderhoydonks and Meulemans' relationship to Defendants (*see* April 2015 Email Chain), and Defendants' decision to communicate with Plaintiff through Vanderhoydonks and Meulemans (*see id.*; *see also* Defs.' SMF ¶ 26 (citations omitted)), are sufficient evidence for a reasonable jury to find apparent authority.[5] Count I survives.

Because Plaintiff presents sufficient evidence of apparent authority to support Count I,

---

[5] Defendants argue Plaintiff must establish by clear and convincing evidence that Vanderhoydonks and Meulemans acted under apparent authority as Defendants' agents. (*See* Mot. 13; Reply 3). Plaintiff argues it must ultimately establish agency by a preponderance of the evidence. (*See* Opp'n 9 (citing *Bank of N.Y. v. Alderazi*, 900 N.Y.S. 2d 821, 824 (N.Y. Sup. Ct. 2010))). Drawing all inferences in favor of Plaintiff, the evidence could support a finding of apparent authority by either clear and convincing evidence or a preponderance of the evidence.

the Court does not address whether there is sufficient evidence of actual authority.[6]

### B. Count II (Conspiracy to Defraud)

There is no independent cause of action for conspiracy to defraud under New York law. *See Alexander & Alexander of N.Y., Inc. v. Fritzen*, 503 N.E.2d 102, 102 (N.Y. 1986). As such, a plaintiff must first demonstrate an underlying fraud exists in order to establish a claim of conspiracy to defraud. *See Maersk, Inc. v. Neewra, Inc.*, 687 F. Supp. 2d 300, 319 (S.D.N.Y. 2009). Once a plaintiff establishes there was an underlying fraud, the plaintiff must show "(1) a corrupt agreement; (2) an overt act in furtherance of that agreement; and (3) membership in the conspiracy by each defendant." *Id*. (citation omitted). Since Plaintiff's fraud claim survives summary judgment, the Court turns to Defendants' arguments as to the remaining elements of conspiracy to defraud.

Defendants argue Plaintiff does not establish a corrupt agreement existed, or that Defendants were members in a conspiracy. (*See* Mot. 19–20; Reply 9–10). Plaintiff disagrees. (*See* Opp'n 17–19).

Plaintiff argues Defendants' fee-sharing agreement with Vanderhoydonks and Meulemans is a corrupt agreement. (*See id.* 17–18). Plaintiff provides a financial breakdown for each of the 12 policies it purchased through Defendants, which details how much Plaintiff paid Defendants, and how Defendants divided the difference between them, Meulemans and Vanderhoydonks. (*See* Pl.'s CMF ¶ 9 (citing Emails Ex. 43 QC 0012030)). Plaintiff states the fact the fee arrangement was kept secret from it is sufficient evidence the fee-sharing agreement

---

[6] Defendants argue Plaintiff may only proceed on a theory of apparent authority, not actual authority. (*See* Mot. 12; Reply 4). The Amended Complaint does not specify whether Vanderhoydonks and Meulemans acted with apparent or actual authority (*see generally* Am. Compl.), only that "Defendants knowingly and intentionally made material misrepresentations of fact to Plaintiff, through the use of their agents Vanderhoydonks and Meulemans" (*id*. ¶ 60). Because Plaintiff has raised genuine issues of material fact for a jury to decide at trial, the Court will not parse the various theories of agency. *See Galarza v. Carnival Corp.*, No. 15-24380-CIV, 2016 WL 7539223, at *2 n.2 (S.D. Fla. Aug. 9, 2016).

constitutes a corrupt agreement. (*See* Opp'n 17–18; *see also* Pl's CMF ¶ 6).

Defendants' Reply highlights the factual disputes between the parties. (*See* Reply 9–10). Defendants do not dispute a fee-sharing agreement existed between Vanderhoydonks and Meulemans and Defendants (*see id.*); rather, Defendants argue "there is nothing sinister or corrupt" about the fee-sharing agreement (*id*. 9). Defendants attach the deposition of Christopher D. Conway [ECF No. 61-1] to their Reply, which states the fee-sharing agreement is a standard agreement (*see id*. 68:7–69:6). But the question of whether or not the fee-sharing agreement is sinister or standard is a question of fact, not appropriate for the Court to decide at summary judgment.

Defendants also argue "[t]here is no evidence [] [Defendants] concealed or kept secret the fee arrangement from [Plaintiff]." (Reply 9–10 (alterations added) (citing Shapiro Dep. 85:19–23)). Nevertheless, Plaintiff claims it had no knowledge of the fee-splitting agreement. (*See* Pl.'s CMF ¶ 6 (citing Shapiro Dep. 23:7–15, 85:19–23; Giorgilli Dep. 74:15–75:23)). Whether Defendants purposefully concealed the existence of the fee-sharing agreement is of no moment. Drawing all reasonable inferences in favor of Plaintiff, the existence of a fee-sharing agreement between Defendants, Vanderhoydonks, and Meulemans – and Defendants' failure to disclose the fee-agreement to Plaintiff – together constitute sufficient evidence for a reasonable jury to find a corrupt agreement existed.

Next, Plaintiff argues there is evidence Defendants took part in a conspiracy to defraud, stating Defendants received "written proof" of the "lies being told to Plaintiff," but still "proceeded to prepare and transmit the purchase contracts at the inflated rate." (Opp'n 18 (citing Pl.'s SMF ¶ 27); *see also* Emails Ex. 20). In their Reply, Defendants fail to address the email exchanges in Exhibit 20, or whether these exchanges are sufficient evidence of Defendants'

membership in a conspiracy to defraud. Again, drawing all reasonable inferences in favor of Plaintiff, the Court finds there is sufficient evidence of Defendants' membership in a conspiracy to defraud. Therefore, Count II survives summary judgment.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendants, Q Capital Strategies, LLC and Life Settlement Solutions LLC's Motion for Summary Judgment **[ECF No. 49]** is **DENIED**.

**DONE AND ORDERED** in Miami, Florida, this 20th day of September, 2018.

_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:   counsel of record